NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: ) <br> ) <br> 106 NORTH WALNUT, LLC, ) <br> ) <br>                 Debtor. ) <br> ) <br> ) <br> 106 NORTH WALNUT, LLC, ) <br> ) <br>           Plaintiff/Appellant, ) <br> ) <br> v. ) <br> ) <br> CITY OF EAST ORANGE, a municipal ) <br> corporation of the State of New Jersey, ) <br> ) <br>          Defendant/Appellee ) | Civil Action No. 08-4221 (GEB) <br><br> **MEMORANDUM OPINION** |

**BROWN, Chief Judge**

     This matter comes before the Court upon an appeal of 106 North Walnut, LLC, ("Debtor" or "Appellant"), from the January 22, 2008 Order of the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). (Docket Entry No. 3-4 at 46.)   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158.  The Court has considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Procedure 78.  For the reasons that follow, the Court will reverse the Bankruptcy Court's January 22, 2008 Order and remand for further proceedings.

**I.     BACKGROUND**

The Court has taken note of the Bankruptcy Court's recitation of the facts, (*see* Docket Entry No. 3-4 at 10 to 23), and therefore, will only summarize those facts here that are relevant to provide context and to address those issues involved in the appeal. This matter is an appeal by Debtor from a final decision of the Bankruptcy Court dated January 22, 2008. The following facts led to Debtor's eventual filing for bankruptcy protection. On October 9, 2002, there was a fire at a property located at 106 North Walnut Street, East Orange, which damaged the roof and top floor of the building (hereinafter "the property" or "the building"). (*Id.* at 11.) The property at 106 North Walnut is a 0.764 acre parcel of land on which, at the time of the purchase, sat a vacant 35,068 square foot, four-story brick, steel, and wood frame thirty-six unit apartment building. (*Id.*) After the fire, on October 17, 2002, the City Construction Official for the City of East Orange (hereinafter "the city" or "Appellee") issued a Notice of Unsafe Structure and Notice of Imminent Hazard, to which was attached an Enforcement Attachment that specified that the structure "had to be rehabilitated or demolished." (*Id.*) However, after two inspections by a structural engineer, Andrew Wu, P.C., the building was reported to be "structurally sound." (*Id.*) Debtor purchased the property for $450,000.00 on March 17, 2003, and knew about the fire damage and the report from the structural engineer. (*Id.*) Debtor planned to renovate the building and fix the fire damage. (*Id.*) Debtor's renovation plans were reviewed by the City code officials. (*Id.* at 12.) Debtor hired Boheh Construction company to renovate the property for the sum of $380,000.00. (*Id.*) The city issued a permit to the contractor for the roof repair on February 3, 2003. (*Id.*)

On June 4, 2003 the East Orange Planning Board began to study whether the area in which the property was located was in need of redevelopment. (*Id.* at 13.) An investigation was conducted,

and a report dated September 29, 2003 was prepared. (*Id.*) As a result, "[t]he Planning Board recommended the Redevelopment Area to be in need of redevelopment and the City thereafter designated the Redevelopment Area to be in need of redevelopment." (*Id.*) A plan was later prepared entitled "North Walnut Street Redevelopment Plan," which was dated December 1, 2003, and it was adopted by the city by Ordinance 126-2004 on February 9, 2004. (*Id.*) During this time, however, between March 17 and December 15, 2003, Debtor had the roof of the property repaired and installed new studs and walls on the top floor, which had been damaged during the fire. Debtor ceased making additional improvements after the city's Construction Official told it that the city was going to demolish the building for the area's redevelopment. (*Id.* at 16.)

Debtor's attorney wrote a letter on April 30, 2004, in which the status of the redevelopment and Debtor's ability to complete renovations to the property was addressed. (*Id.* at 15 to 16.) Apparently, the letter was shown to the City Construction Official, who told the Redevelopment Director that "he was handling the matter." (*Id.* at 16.) Thereafter, on November 4, 2004, at approximately 3:55 P.M., after several other meetings and communications, the city's attorney received a letter confirming that Debtor may proceed with renovations to the property. (*Id.* at 16 to 18.) The City Attorney showed the letter to the City Construction Official. (*Id.* at 18.) Nevertheless, on the same date, at approximately 8:00 P.M., the City Construction Official ordered a worker at the demolition company hired by the city to immediately begin the demolition of the property. (*Id.* at 19.) Subsequently, the building was completely torn down, and the property now remains vacant. (*Id.* at 21.)

Debtor filed a voluntary petition for bankruptcy on February 28, 2005. (*Id.* at 22.) The Bankruptcy Judge conducted a hearing, and an Order confirming the Chapter 11 Plan was entered

on May 22, 2007. (*Id.* at 23.) An adversary proceeding was initiated on August 23, 2005, and trial commenced on August 3, 2007. (*Id.*) At the conclusion of the trial, on January 22, 2008, the Bankruptcy Court issued a Memorandum Decision, which rejected the Debtor's claim that the City was liable under the doctrine of inverse condemnation, and concluded instead that the City's actions were "negligent and contrary to protections afforded property owners under New Jersey Law." (Docket Entry No. 3-4 at 26.) Debtor appeals from an order of the same date which embodied that ruling.

## II.   DISCUSSION

### A.   Standard of Review

Bankruptcy Rule 8013 provides that the district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . ." FED. R. BANKR. P. 8013. A factual finding is clearly erroneous only where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Cellnet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). A Bankruptcy Court's conclusions of law, on the other hand, are reviewed *de novo*. *Id.* Where mixed questions of law and fact are presented, the appropriate standard must be applied to each component of the appeal. *Id.*

**B.     The Bankruptcy Court Erred In Concluding That the Demolition Did Not Amount to Inverse Condemnation**

**1.     The Parties' Arguments**

The Appellant Debtor argues that the city's wrongful demolition of its property in addition to the restrictions imposed under the Redevelopment Plan deprived Appellant of "all economic and beneficial use of the property," and to this end, Appellant states that "the Bankruptcy Court did not consider the true economic impact of the [c]ity's actions."  (Docket Entry No. 3 at 30, 32.) Appellant urges that a finding should be made that the city's actions resulted in the inverse condemnation of the property and that the Bankruptcy Judge erred in finding otherwise. (*Id.* at 32.) Appellant contends that "[t]he demolition rendered the property a vacant land with no income potential." (*Id.* at 30.)  Appellant argues that the city's actions have "effectively resulted in a taking without . . . the benefit of the judicial process."  (*Id.* at 37.)  Appellant asks the Court to modify the Bankruptcy Judge's determination and award Appellant just compensation and all legal fees and costs to prosecute this action under N.J.S.A. § 20:3-26(c).  (*Id.*)  Appellant also argues that the Court should award it interest on these amounts starting from the date of the taking.  (*Id.*)

Appellant also emphasizes that the Court should find that the Bankruptcy Judge failed to fully address "the true economic impact of the [c]ity's actions" because Appellant "could not finance any construction to generate an income producing use since the property was already overburdened by debt."  (*Id.* at 31.)  Appellant argues "it would not have been permitted to construct new improvements" given the parameters of the Redevelopment Plan insofar as the city restricted redevelopment to its own designated developer.  (*Id.*)  Appellant further maintains that "any investment in new construction could be at risk of being non-compensable in a future condemnation

5

action" because "the [c]ity could claim that any construction was done in bad faith solely for the purpose of increasing the condemnation award." (*Id.*)  It contends that its "only option after the demolition" was to sell the property, but that the "city's Redevelopment Plan destroyed any market" for the property because "the only potential buyers would be the city or its designated redeveloper." (*Id.* at 31 to 32.)  Additionally, Appellant argues that the city "refused to move forward and acquire the property," and it would have waited for "tax liens to accrue" to eventually take the property "for nothing" in tax-related foreclosure proceedings. (*Id.* at 32.)

However, Appellee City urges that the Court affirm the Bankruptcy Judge's findings and conclusions.  It counters that Appellant did not establish during the adversary proceeding that the city demolished the building pursuant to its powers of eminent domain and that as a result, the Court should find that the demolition of the building does not constitute a compensable taking.  (Docket Entry No. 6 at 9.)  Appellee contends that the principles of inverse condemnation do not apply because the Bankruptcy Judge properly found that the building "was demolished by the [c]ity in order to abate an unsafe condition and public eyesore . . . rather than [to] attempt to condemn or further the [c]ity's [R]edevelopment [P]lan or any public use." (*Id.*)  Appellee states that "a property owner is not entitled to be compensated through a theory of taking in the constitutional sense where the city did not acquire the properties through condemnation, but merely placed certain restrictions on the use of the property." (*Id.* at 10.)  Appellee maintains that "the record is devoid of any evidence" that would indicate that steps were taken to condemn the property or that would "prolong a condemnation proceeding only to abandon it." (*Id.* at 11.)   Instead, Appellee argues that "the [c]ity's [c]onstruction [o]ffice had demolished the [property] after issuing a Notice of Unsafe Structure and Notice of Imminent Hazard, concluding that the structure was unsafe following [the]

fire damage." (*Id.*)  Appellee contends the city "acted to eliminate a public nuisance when it demolished the . . . [p]roperty" believing it posed "a public hazard." (*Id.* at 12.)  Appellee argues the Bankruptcy Court properly "found negligence in the manner in which the [c]ity demolished the . . . [p]roperty." (*Id.*)

Further, Appellee argues that "there has been no substantial interference with or denial of the beneficial economic use of the . . . property." (*Id.* at 13.)  Appellant states that "[a] property owner is not entitled to be compensated" when it is alleged that a municipality restricted a property owner's use of his property. (*Id.*)  Appellee contends that Appellant did not show during the adversary proceeding that the city prevented it from rebuilding the partially demolished building in order to put it in marketable or rentable condition. (*Id.* at 15.)  Rather, Appellee maintains that the Debtor failed to complete the building's rehabilitation, and that this was expensive for the city because it had to refrain from demolishing the building for eleven months. (*Id.*)  Appellee also points out that this period of time left the property open to vandalism.  Therefore, Appellee essentially argues that the Court should affirm the Bankruptcy Court's decision because it properly concluded that Appellant had not been "deprived of all or substantially all of the beneficial use of the totality of the . . . property." (*Id.* at 16.)

In addition, Appellee argues that the "Debtor's claims sound in tort rather than in condemnation." (*Id.*)  Appellee urges that this Court affirm the Bankruptcy Court's decision because "the Debtor is unable to demonstrate for what public use the building was demolished . . . or that the property was occupied by the city." (*Id.* at 17.)  Appellee states that there was "little . . . progress with respect to the city's redevelopment plan and no evidence, or even logic, to support that the [c]ity had a sinister motive to effectuate a taking of the Debtor's property as part of a strategy to reduce

the compensation to be paid." (*Id.*) Appellee contends that "the building was demolished pursuant to the [c]ity's police powers to eliminate unsafe structures, rather than to use the property for public use." (*Id.*) Appellee also argues that "a governmental action, such as demolishing an unsafe structure, is not a taking for public use because the governmental entity does not acquire any right of [sic] thing for public use when it demolishes the structure." (*Id.*)

### 2. The Bankruptcy Court's Decision

The Bankruptcy Court held that the city's actions did not rise to a level constituting inverse condemnation. (Docket Entry No. 3-4 at 25.) In support of this decision, the Bankruptcy Judge noted that "the record does not support a finding that the City undertook the demolition of the building as either a means to effectuate a taking of the Debtor's property or as a part of a strategy to reduce the compensation to be paid" and also noted that the city never "issued a declaration of its intent to take the . . . [p]roperty" and that the Debtor also never "introduced evidence establishing the [c]ity's intent." (*Id.* at 24 to 25.) Factually, the Bankruptcy Judge found that Raheem, the Construction Official, "undertook his actions in the context of fulfilling his responsibilities as a construction official, motivated by a desire to abate an unsafe condition and public eyesore," rather than to take the Debtor's property. (*Id.*) Finally, the Bankruptcy Court held that Debtor failed to demonstrate that the city "prevented or continues to prevent the Debtor from rebuilding the structure to a marketable/rentable condition," and as a result, "the invocation of inverse condemnation is [not] warranted." (*Id.*)

The Bankruptcy Judge, in support of his findings and conclusions, stated the following:
> This is not to say that the Court regards the actions of the City, in the manner

> in which it proceeded to demolish the Subject Property, to be consistent with the duties imposed by law and free of liability. As discussed below, this Court finds that the actions undertaken by the City in ordering the demolition of the building to be negligent and contrary to protections afforded property owners under New Jersey law. Thus, Debtor's claims more properly sound in tort rather than inverse condemnation. New Jersey law recognizes the distinction between inverse condemnation and tort claims. *See Greenway Development Co., Inc. v. Borough of Paramus*, 163 N.J. 546, 769 (2000) (New Jersey Torts Claim Act inapplicable to inverse condemnation claims). "Fault or lack of reasonable care, essential to the tort of negligence, simply are not involved in the concept of inverse condemnation. Inverse condemnation is similar to a products liability manufacturing defect case in that the plaintiff in both types of cases is not required to prove fault." *Id.* (citations omitted).

(*Id.* at 26.) In support of this finding, the Bankruptcy Court found that "the [c]ity failed to conduct a diligent search to find the owner of the . . . [p]roperty" as is required by New Jersey Statute, but did make some effort to contact the owner by affixing a notice to the door of the Debtor's building. *See* N.J.A.C. § 5:23-2.32(a)(4). (Docket Entry No. 3-4 at 30.) Further, the Bankruptcy Judge noted that under the New Jersey Administrative Code, in order to effectuate an "emergency demolition" certain requirements must be met, *see* N.J.A.C. § 5:23-2.32(b), and Raheem failed to "inspect the interior of the building," "ordered the demolition without a prior asbestos inspection or notification to PSE&G," and failed to provide "24 hour notice of the demolition to the owner." (*Id.* at 32.) Having considered these facts, the Bankruptcy Court determined that there was "no urgency to demolish" Debtor's building. (*Id.* at 32.) Finally, the Bankruptcy Court found that the property was not "an imminent danger" and Raheem's professed concern that it was "an imminent danger does not comport with his testimony that initial renovation efforts improved the situation." (*Id.* at 32.)

### 3. Analysis

The Fifth Amendment, made applicable to state and local governments under the Fourteenth

Amendment, proscribes the taking of private property for public use without just compensation. *See Cowell v. Palmer Twp.*, 263 F.3d 286, 290 (3d Cir. 2001); *see also* N.J. CONST. art. I, ¶ 20. Although "[t]he clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use . . . there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). However, "[d]irect condemnation, by invocation of the State's power of eminent domain, presents different considerations than cases alleging a taking based on a burdensome regulation." *Id.* at 628. "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 316 (1987). In other words, inverse condemnation principles provide a remedy for a landowner who seeks just compensation "for a taking of his property when condemnation proceedings have not been instituted," which in essence constitutes a "de facto taking" of the property at issue. *United States v. Clarke*, 445 U.S. 253, 257 (1980); *Greenway Dev. Co. v. Borough of Paramus*, 163 N.J. 546, 553 (N.J. 2000). As one New Jersey court has stated, "the physical taking of real property by a governmental agency, without compliance with the statutory safeguards established by the Legislature for the lawful exercise of the power of eminent domain, constitutes an act of inverse condemnation." *Raab v. Borough of Avalon*, 392 N.J. Super. 499, 503 (App. Div. 2007).

  An owner of property "'is barred from any claim to a right to inverse condemnation unless deprived of all or substantially all of the beneficial use of the totality of his property as the result of

excessive police power regulation.'" *Greenway*, 163 N.J. at 553 (citing *Pinkowski v. Twp. of Montclair*, 299 N.J. Super 557, 575 (App. Div. 1997)). The New Jersey Supreme Court has also held that "where the threat of condemnation has had such a substantial effect as to destroy the beneficial use that a landowner has made of his property, then there has been a taking of property within the meaning of the Constitution." *Wash. Mkt. Enters., Inc. v. City of Trenton*, 68 N.J. 107, 122 (1975) (addressing a situation where the city undertook and later abandoned a redevelopment project, which resulted in the destruction of the value of the plaintiff's commercial property). "[A] declaration of blight, in and of itself, will not constitute a taking" but where "in addition to the declaration of blight, other related activities together with the passage of time are said to have shorn property of literally all or most of its value," a finding of inverse condemnation is appropriate. *Id.* at 115. To sustain such a claim, "the plaintiff will be required to show that there has been a substantial destruction of the value of its property and that defendant's activities have been a substantial factor in bringing this about." *Id.* at 123; *see also Casino Reinvestment Dev. Auth. v. Hauck*, 162 N.J. 576, 579 (2000).

While the "mere plotting and planning in anticipation of condemnation without any actual physical appropriation or interference does not constitute a taking," certain factors should be considered "when the threat of condemnation has had such a substantial effect as to destroy the beneficial use that a landowner has made of the property," which are: "(1) extraordinary delay or unreasonable conduct on the part of the condemning authority; (2) the imminence of condemnation; and (3) the severity of the injury and hardship to the property owner." *Littman v. Gimello*, 115 N.J. 154, 161, 167-68 (1989) (citation omitted); *Nierenberg*, 150 N.J. at 143 (O'Hern, J., dissenting) (citation omitted). However, a claim for inverse condemnation becomes ripe only after "the

government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 346-46 (2005) (citation and internal quotations omitted); *see also Palazzalo*, 533 U.S. at 618-21.

The issue presented to the Bankruptcy Court, and now on review in this Court, is whether the Redevelopment Plan in conjunction with the demolition of the Debtor's building amount to inverse condemnation. The Bankruptcy Court, in addressing these issues, considered whether the demolition of the building was evidence of the city's intent to carry out the Redevelopment Plan. In its decision, the Bankruptcy Judge wrote that "the record does not support a finding that the City undertook the demolition of the building as either a means to effectuate a taking of the Debtor's property or as part of a strategy to reduce the compensation to be paid." (Docket Entry No. 3-4 at 24 to 25.) The Bankruptcy Judge also noted that "[a]t no time has the City issued a declaration of its intent to take the Subject Property and neither has the Debtor introduced evidence establishing the City's intent in this regard." (*Id.* at 25.) However, this Court concludes that the standard of law governing inverse condemnation does not include consideration of the city's subjective intent. Rather, it is an objective inquiry requiring the Court's determination in respect to whether the Redevelopment Plan substantially affected and destroyed the beneficial use that Debtor made of the property and whether the city deprived Debtor of all or substantially all of the beneficial use of his property. Therefore, the subjective intent of the city noted by the Bankruptcy Judge is not relevant.

The Bankruptcy Court also made the following findings:

> [T]he Court accepts that both Alternative A and Alternative B under the Redevelopment Plan, approved by the City, provided for the acquisition and demolition of the Subject Property. Yet, there has been very little, if any, progress

> with respect to the redevelopment and it is clear that in order for the City to pursue its redevelopment plans, the City's designated redeveloper would have to compensate the Debtor in an amount at least equal to fair market value of the Subject Property on the date on which the City declared the property to be in an area in need of redevelopment. N.J.S.A.§ 20:3-30(d).

(Docket Entry No. 3-4 at 24.) The Bankruptcy Judge stated that "[t]here has been no demonstration that the City has prevented or continues to prevent the Debtor from rebuilding the structure to a marketable/rentable condition," and for this reason, Debtor failed "to show a sufficiently serious interference with the use of its property and deprivation of its economic benefits" citing *Greenway Dev. Co. v. Borough of Paramus*, 163 N.J. 546, 553 (2000), for the proposition that "not every impairment of value establishes a taking" and that "the landowner must be deprived of all reasonable beneficial use of the property." (Docket Entry No. 3-4 at 25.)

In this Court's *de novo* review of the Bankruptcy Court's legal conclusions, it will also take note of the factual findings made by that Court. In addition to those points previously mentioned, the Court finds most relevant the following findings: (1) "[o]n or about December 15, 2003, the Debtor's principal, Michael Feldman, believed that the condemnation of the Subject Property was imminent" and therefore "opted not to proceed with any additional investment in the Subject Property" (Docket Entry No. 3-4 at 15); (2) in a letter dated June 10, 2004, James Slaughter, who was the Director of the Department of Policy, Planning and Development for East Orange, wrote to Debtor that "a redeveloper would be selected for the property" (*Id.* at 16); and (3) on November 1, 2004, the city informed Debtor's attorney "that the City did not have any immediate plans to condemn the Subject Property and that the Debtor was free to go ahead with its rehabilitation of the property" but on November 4, 2004, Raheem "stated to Kleckley that the City was going to demolish the improvements on the Subject Property" and soon after, Kleckley left a message for Debtor's

13

attorney to relay Raheem's statement. (*Id.* at 17 to 18).

In light of these factual findings, which this Court finds are not clearly erroneous based on the record, the Court addresses whether Appellant's inverse condemnation claim is ripe. As previously stated, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," *San Remo Hotel, L.P.*, 545 U.S. at 346-46 (citation and internal quotations omitted) and that "a declaration of blight, in and of itself, will not constitute a taking" but where "in addition to the declaration of blight, other related activities together with the passage of time are said to have shorn property of literally all or most of its value," a finding of inverse condemnation is appropriate. *Wash. Mkt. Enters, Inc.,* 68 N.J. at 115. Given the totality of the circumstances, and the "other related activities" at play in this situation, the matter is ripe for adjudication and the Court concludes that these facts rise to the level of an inverse condemnation.

The time-line of events persuade this Court that the facts require a conclusion that the city's actions constitute an inverse condemnation. From December 2003 until November 1, 2004, the city's plan to redevelop this area was imminent. City officials told Debtor to refrain from making any further improvements to the property because the city was planning to demolish the building as part of the Redevelopment Plan. (Docket Entry No. 3-4 at 16.) A letter dated May 11, 2004 was sent to Debtor "confirming the property was subject to the Redevelopment Plan which called for its acquisition and demolition." (*Id.*) In a letter dated June 1, 2004, Debtor wrote to the city's Director of the Department of Policy, Planning and Development, and asked whether it would be permitted to continue to rehabilitate the building, or "whether a redeveloper was to be designated for the

14

property," and in reply, the city responded that "a redeveloper would be selected." (*Id.*) Although the Construction Official, Raheem, had marked the building as "an unsafe structure," notice of this was not communicated to Debtor at that time. (*Id.* at 16 to 17.) Thereafter, between August 2004 and October 2004, communications of substance between Debtor and the city ceased. (*Id.* at 17.) On October 15, 2004, the city posted a notice of violation on Debtor's building, indicating that it was an unsafe structure, but the city never served notice on Debtor or Debtor's counsel. (*Id.*)

It was not until November 1, 2004, nearly one year after the city first told Debtor to stop making improvements to the building that Debtor received any indication that condemnation was not imminent. (*Id.*) At that time, Ronald Kleckney, Esq., Assistant Corporation Counsel, told Debtor's attorney that "Debtor was free to go ahead with its rehabilitation of the property." (*Id.*) Debtor's attorney, three days later, on November 4, 2004, at 3:55 p.m., faxed a letter to Kleckney to memorialize their November 1st conversation. (*Id.* at 18.) However, Raheem, the city Construction Official, upon review of the letter within thirty minutes of its receipt by Kleckney, told Kleckney that in fact "the City was going to demolish the improvements on the Subject Property." (*Id.*) Immediately thereafter, Kleckney called Debtor's attorney and left a voice mail that despite their November 1st conversation, "the Construction Official said the building 'was going to be demolished.'" (*Id.*)

Therefore, the Court concludes that the apparent imminence of condemnation for approximately one year, as is evidenced by the communications between Debtor and the city, followed by the November 4, 2004 demolition of the building including the repairs that Debtor had made to the property, amount to inverse condemnation. The facts show that aside from the three days between November 1 and November 4, 2004, during which time Debtor was told that "the City

15

did not have any immediate plans to condemn the Subject Property and that the Debtor was free to go ahead with its rehabilitation of the property," Debtor was otherwise under the impression that the Rehabilitation Plan of the area of land that encompassed the Debtor's property was going to be executed. Therefore, there was not just a designation of blight, but rather, other steps had been taken to execute the plan, and on top of this, after the demolition of the building, "[t]he Subject Property was reduced to vacant land." (Docket Entry No. 3-4 at 21.)

The Court notes that "[f]ault or lack of reasonable care, essential to the tort of negligence, simply are not involved in the concept of inverse condemnation; inverse condemnation is similar to a products liability manufacturing defect case in that the plaintiff in both types of cases is not required to prove fault." *Greenway Dev. Co., Inc.*, 163 N.J. at 556. The Court thus needs not make a finding regarding whether or not the city was at fault when it demolished the building. Whether the city's actions amount to inverse condemnation is a inquiry of fact, and thus, any discussion regarding the city's intent to either take the property or demolish it for some economic gain is irrelevant. Although the Court draws no inference of fault, blame, or malicious intent, the fact remains that the city began the demolition of Debtor's building "in the dark of night" after, aside from the three days in early November 2004, a year had passed during which time it appeared that the Redevelopment Plan was imminently moving forward.

Debtor filed for bankruptcy protection approximately four months later on February 28, 2005. The property, now approximately four years later, sits vacant. Although the Bankruptcy Court placed emphasis on its finding that no further actions have been taken to date in furtherance of the Redevelopment Plan, the Court notes that Debtor filed for bankruptcy over four years ago, and thus, the property has been the subject of litigation. Therefore, the Court considers the city's actions prior

16

to November 4, 2004, rather than thereafter as being the most significant in determining whether its actions amounted to inverse condemnation. The fact remains that the vacant lot remains in a redevelopment zone that prior to the instant litigation was to be redeveloped. Thus, these "other activities" in addition to the declaration of blight and adoption of the Redevelopment Plan, which include the fact that plans were created for the area, that there were communications to Debtor to stop making improvements to the property, and that there was an "in fact" demolition of Debtor's property, regardless of intent, blame, or fault, which resulted in the subsequent bankruptcy of Debtor and the passage of time during which the property has sat vacant.

The Court concludes that as a result of the city's actions, Debtor is left without a satisfactory means to regain economic value for the property in the marketplace. It was forced to file bankruptcy, it cannot get financing to rebuild, it cannot sell the property due to its location in the Redevelopment Zone, and it has not been able to make any use of it due to the city's demolition. It is for all of these reasons that this Court concludes as a matter of law that inverse condemnation occurred in this instance.

In light of this Court's decision, the Court will remand this matter to the Bankruptcy Judge for further proceedings to determine the just compensation due to Debtor.

### III.   CONCLUSION

For the foregoing reasons, the Court reverses the Bankruptcy Court's decision and remands the matter to the Bankruptcy Court for further proceedings. An appropriate form of Order accompanies this Opinion.

Dated: June 17, 2009

                                                                  s/ Garrett E. Brown, Jr.
                                                   GARRETT E. BROWN, JR., U.S.D.J.